## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT S. VASQUEZ,** | ) | **CASE NO.  1:05 CV 1684** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **JUDGE DAN AARON POLSTER** |
| **vs.** | ) | |
| | ) | |
| **MARGARET BRADSHAW, Warden,** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **Respondent.** | ) | |

Before the Court is the Report and Recommendation of Magistrate Judge George J. Limbert ("R&R") **(ECF No. 35)**.  Pending is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By A Person In State Custody, filed by Petitioner Robert S. Vasquez[1] (the "Petition") **(ECF No. 1)**.  For the following reasons, the Court declines to adopt the R&R and **CONDITIONALLY GRANTS** the writ.

### I.  PROCEDURAL BACKGROUND

On December 18, 2000, Vasquez was sentenced to life imprisonment for his conviction on a rape charge.  (ECF No. 31-4, Ex. 3, Judgment Entry.)  He was also sentenced to nine years' imprisonment, to run concurrently, for his conviction on a kidnapping charge.  (*Id.*)  Vasquez was represented at trial and at sentencing by attorney Donald Butler.  On March 7,

---

[1]Petitioner shall be referred to as "Vasquez" or "Petitioner" throughout this Opinion.

2000, more than one month after the expiration of his time for filing a direct appeal, Vasquez filed a *pro se* notice of appeal of his conviction.  (ECF No. 31-5, Ex. 4, Notice of Appeal.)  On March 21, 2001, newly-appointed appellate counsel Norm Incze filed a motion for leave to file a delayed direct appeal.  (ECF No. 31-6, Ex. 5, Motion for Leave to File Delayed Appeal.)  On April 6, 2001, attorneys Mark Marein and Steven Bradley (new counsel retained by Vasquez's family) filed another motion for leave to file delayed direct appeal.  (ECF No. 31-7, Ex. 6, Motion for Order Granting Leave of Court File Delayed Appeal Instanter.)  The Ohio Court of Appeals granted Vasquez leave to file a delayed direct appeal on April 12, 2001.  (ECF No. 31-8, Ex. 7, Journal Entry.)  After receiving the parties' briefs, the appellate court affirmed the convictions in a decision issued November 1, 2001.  (ECF No. 31-12, Ex. 10, Journal Entry and Opinion.  *See also*, *State v. Vasquez*, No. 79319, 2001 WL 1352781, 2001 Ohio App. LEXIS 4910 (Ohio Ct. App. Nov. 1, 2001).)  Vasquez did not appeal this decision to the Ohio Supreme Court.

On July 23, 2001, while his direct appeal was pending in the Ohio Court of Appeals, attorneys Marein and Bradley filed a motion for leave to file a motion for new trial in the Court of Common Pleas.  (ECF No. 31, Ex. 11, Motion for Leave to File New Trial Motion Instanter (previously filed at ECF No. 13).)  The trial court (Judge Robert Glickman[2]) granted leave to file a motion for new trial.  (ECF No. 31-13, Ex. 12, Journal Entry.)  One week later, the trial court vacated its order and held the motion for leave in abeyance until the Ohio Court of Appeals ruled on Vasquez's appeal.  (ECF No. 31-14, Ex. 13, Journal Entry.)

_____

[2]Judge Frank D. Celebrezze, Jr., who presided over the trial and sentencing, was no longer sitting on the Cuyahoga County Court of Common Pleas, having been elected to the Ohio Court of Appeals, Eighth Appellate District in November of 2000.

-2-

While his direct appeal was pending, attorneys Marein and Bradley also filed a petition for post-conviction relief in the trial court, accompanied by affidavits from witnesses Vasquez claimed would have testified at trial had attorney Butler investigated the case properly. (Post-Conviction Hearing Findings, at 1-2.)  These affiants/would-be witnesses included Ms. Tammy Salopek; Ms. Ashley Snyder; Ms. Joanne Kitchen; Ms. Becky Shaffer (nee Egbertson[3]) ("Becky Shaffer" or "Becky"); and Ms. Karra Vasquez ("Karra Vasquez" or "Karra"[4]).[5]  (ECF No. 31-15, Ex. 14, Petition for Post-conviction Relief.)  On May 14-17, 2002, Judge Glickman held a hearing on both the petition for post-conviction relief and the motion for new trial, at which the affiants testified.  (ECF No. 31, Exs. 37-38.)  Butler and Vasquez also testified.[6]  (*Id.*)  After additional briefing by the parties, the court denied both the petition and the motion for leave to file a motion for new trial.  (ECF Nos. 31-37, Ex. 23; 31-38, Ex. 24; 31-39, Ex. 25.)  (The testimony presented at the post-conviction hearing is addressed later in this Opinion.)

---

[3]At the time of the alleged incident and subsequent trial, Becky's last name was Egbertson, and she was engaged to be married to Don Shaffer.  Don and Becky married in February of 2001, at which point Becky took Don's last name and became Becky Shaffer, which was her name at the time of the post-conviction hearing.  For simplicity's sake, the Court will refer to Becky Shaffer rather than Becky Egbertson throughout this Opinion.

[4]Ms. Vasquez's name is spelled differently throughout the Record, sometimes as "Karra" and spelled "Kara" at other times.  The Court uses "Karra" in this Opinion, as that is the spelling used in the post-conviction hearing transcript.

[5]Though Vasquez's initial petition for post-conviction relief only listed Karra Vasquez and Kitchen, Vasquez later filed, with leave of court, a supplemental memorandum that added the additional witnesses. (Post-Conviction Hearing Findings, at 1.)

[6]Vasquez also called Ms. Sally McHugh and Mr. Richard Lillie as witnesses.  McHugh denied in her testimony that she threatened to remove Karra Vasquez's children from the home if she cooperated with her husband's defense.  (Hr'g Tr. 402:17-21.)  The State also called witnesses James Chappelle and Officer Timothy Zbikowski.

The relevant testimony for purposes of the instant petition, however, is the testimony given by Tammy Salopek, Ashley Snyder, Joanne Kitchen, Becky Shaffer, Karra Vasquez, Vasquez, and attorney Butler.

Represented again by attorneys Marein and Bradley, Vasquez appealed the denial of his post-conviction petition to the Ohio Court of Appeals.  (ECF No. 31-40, Ex. 26.)  The appellate court affirmed the trial court's denial of Vasquez's post-conviction petition.  (ECF No. 31-53, Ex. 30, Journal Entry and Opinion; see also ECF No. 31-54, *State v. Vasquez*, No. 82156, 2004 WL 35766, 2004 Ohio 53; 2004 Ohio App. LEXIS 47 (Ohio Ct. App. Jan. 8, 2004).)

Represented anew by attorney Karl Rissland, Vasquez appealed the decision of the Ohio Court of Appeals to the Ohio Supreme Court.  (ECF No. 31-55, Ex. 32.)  On June 9, 2004, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (ECF No. 31-60, Ex. 36.)

On June 29, 2005, represented by attorney Gordon Friedman, Vasquez filed the instant habeas petition alleging the following four grounds for relief:

GROUND ONE:  Denial of effective assistance of [trial] counsel as guaranteed by [the] Sixth Amendment [to the] U.S. Constitution.

Supporting Facts:  Although Petitioner was facing a life sentence, counsel failed to adequately meet and discuss the charges.  Counsel met Petitioner only three times in sessions of 15-20 minutes each.

GROUND TWO:  Ineffective assistance of [trial] counsel.

Supporting Facts:  Counsel failed to adequately investigate [the] case and interview potential witnesses, including various family members of Petitioner and individuals present at the time of the alleged crime.

GROUND THREE:  Ineffective assistance of [trial] counsel.

Supporting Facts:  Counsel failed to adequately prepare for trial.  He filed only three boilerplate motions, none of which were tailored to the specific charges or facts of Petitioner's case.  There was no attempt to challenge competency of minor child.  No attempt to review records of Children's Services relating to victim.  No Motion to Appoint Investigator in life case; no Motion for Independent Psychological Exam of Victim; No request of ER Report; no request for EMS report.

GROUND FOUR:  Ineffective assistance of [trial] counsel.

Supporting Facts:  In trying case.  Because of failures above, the cross-examination [of] state witnesses which led to the admission of damaging evidence relating to Petitioner that would otherwise have been inadmissible.

(ECF No. 1, Petition at 4-5.)

On November 3, 2005, Respondent filed a motion to dismiss the habeas petition as time-barred, or, in the alternative, to hold the petition in abeyance pending exhaustion of state remedies on the grounds that the petition contains both exhausted and unexhausted claims.  (ECF No. 11.)  Vasquez filed a brief in opposition to Respondent's motion to dismiss on December 5, 2005.  (ECF No. 16.)  Magistrate Judge Limbert issued an Interim Report and Recommendation on March 29, 2006.  (ECF No. 17)  Both parties filed Objections thereto.  (ECF Nos. 18, 21.)

The Court then issued a Memorandum of Opinion and Order on June 22, 2006, declining to adopt the Interim Report and Recommendation, and granting Respondent's motion to hold the petition in abeyance, pending exhaustion of Vasquez's state court remedies.  (ECF No. 23.)  In the order, the Court also found that Vasquez's first and second habeas claims were exhausted, *id.* at 7, his third claim was procedurally defaulted, *id.* at 11-12, and his fourth claim was unexhausted, *id.* at 14 (incorrectly reciting that "Vasquez's third ground for relief is unexhausted.") because he had not filed a direct appeal with the Ohio Supreme Court.

Vasquez returned to state court to fully exhaust his claims by filing a motion for delayed appeal with the Ohio Supreme Court.  (ECF No. 24.)  On October 4, 2006, the Ohio Supreme Court denied his motion.  (ECF No. 25.)  Vasquez filed a notice of return to federal court on October 25, 2006.  (ECF No. 26.)

Pursuant to the Court's June 22, 2006 Order, Magistrate Judge Limbert retained jurisdiction over the case for a review of the merits upon Vasquez's return to federal court. (ECF No. 23, 15.)  Respondent filed a Return of Writ on January 12, 2007, ECF No. 30, accompanied by a lengthy Appendix to Return of Writ containing the entire record to that point, ECF No. 31.  After receiving an extension of time, Vasquez subsequently filed his Traverse to Return of Writ on March 5, 2007.  (ECF No. 34.)

Magistrate Judge Limbert issued his Report and Recommendation on April 13, 2007, recommending that the Court dismiss the petition, on the merits as to grounds (1) and (2), and due to procedural default for grounds (3) and (4).  Vasquez filed timely Objections to the R&R, ECF No. 37, and the Court ordered Respondent to respond to the Objections, to which Vasquez was ordered to file a reply, ECF No. 38.  Respondent filed a response to Vasquez's Objections on June 12, 2007.  (ECF No. 39.)  Vasquez filed his reply on July 26, 2007.  (ECF No. 41.)

## II.  FACTUAL BACKGROUND

Pursuant to 28 U.S.C. § 2254(e)(1), the Court "is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption."  *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (*quoting McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004) (citations omitted)).  The Court counts numerous court recitations[7] of "the facts" in the case record.[8]  Notably, however,

---

[7]As opposed to "findings" of facts.

[8]See **ECF No. 31**, Appendix to Respondent's Return of Writ, **Ex. 1** (ECF No. 31-2, Lexis version of state appeals court opinion on direct appeal affirming conviction, *State v. Vasquez*, No. 79319, 2001 Ohio App. LEXIS 4910 (Nov. 1, 2001)); **Ex. 10** (ECF No. 31-12, Journal Entry and Opinion for same, Cuyahoga App. No. 79319, Nov. 1, 2001); **Ex. 24** (ECF No. 31-38, Findings of Fact and Conclusions of Law after

only two <u>findings</u> of fact serve as the basis for all the other recitations; first, the Ohio Court of

Appeals' November 1, 2001 opinion on Vasquez's direct appeal (the "Direct Appeal Opinion"),

and second, the Ohio Court of Common Pleas December 6, 2002 Findings of Fact and

Conclusions of Law issued following Vasquez's post-conviction hearing (the "Post-conviction

Hearing Findings").  The other recitations (whether nominally termed "findings" or otherwise)

of fact relied in whole or in part on the findings from either or both of the above-mentioned two

opinions.  Consequently, any facts that, upon a closer review, appear erroneous were perpetuated

in later opinions.

       While the Court must generally defer to the factual findings of the state courts, the

Court may make its own factual findings in place of "facts" that are erroneous as shown by clear

and convincing evidence.  *See Benge*, 474 F.3d at 241.  A comprehensive review of the 800-plus

pages of transcript in the record, in addition to the rest of the documents contained in the record,

provides clear and convincing evidence that the facts as found in the Direct Appeal Opinion and

Post-conviction Hearing Findings (and, therefore, the Post-conviction Appeal Opinion) are

inaccurate in numerous places.  Accordingly, the Court will cite to the trial ("Trial Tr.") and

---

post-conviction hearing, Cuyahoga Court of Common Pleas, No. CR394976, December 8, 2002); **Ex. 30** (ECF No. 31-53, Journal Entry and Opinion of state appeals court on appeals of denial of petitioner for post-conviction relief and motion for leave to file motion for new trial, *State v. Vasquez*, Cuyahoga App. No. 82156, Jan. 20, 2004 (the "Post-conviction Appeal Opinion")); **Ex. 31** (ECF No. 31-54, Lexis version of same, 2004 Ohio 53, 2004 Ohio App. LEXIS 47 (Ohio App. Jan. 8, 2004)); and **<u>ECF No. 17</u>**, Interim Report and Recommendation of Magistrate Judge.

post-conviction hearing ("Hr'g Tr.") transcripts to support its conclusion that certain factual findings by the state courts are clearly erroneous.

The facts of the underlying case are as follows.

## A.  The Alleged Attack

On July 23, 2000, nine-year-old Ashlee Loomis ("Ashlee"[9] or "Ashlee Loomis") and her father, Steve Loomis ("Steve" or "Steve Loomis"), went to Don Shaffer's ("Don Shaffer" or "Shaffer") house to join friends in eating a late dinner.  (ECF No. 31, Ex. 10, Direct Appeal Opinion, at 618.)  By the time Ashlee and Steve Loomis arrived at Don Shaffer's condominium, however, it was late and Shaffer and Becky had retired for the night.  (*Id.* at 619.) Vasquez, his wife Karra[10], and their two young daughters Ashley and Renee[11] had just moved in to Don Shaffer's basement earlier that day.  (ECF No. 31 Appendix to Answer/Return of Writ, Ex. 38, Hr'g Tr. at 243:12-13; 306:24–307:10.)  At some point after Ashlee ate her fast food, she descended the 10-12 stairs to the basement of Don Shaffer's condo at least once.  (Hr'g Tr. at 306:11-14.)  Karra Vasquez and Steve Loomis were upstairs, just at the screen door that is situated at the top of the stairs that lead into the basement.  (Hr'g Tr. at 305:9.)  Vasquez, meanwhile, was in the basement with the two Vasquez girls, and, for a period of about five minutes, with Ashlee.  (Hr'g Tr. at 302:22-25.)  Approximately 15-20 minutes after Ashlee and

---

[9]Ashlee Loomis should not be confused with Ashley Snyder (a friend of Ashlee Loomis, and a witness for Vasquez) or with Ashley Vasquez (the Vasquezes' daughter).

[10]Karra Vasquez is one of Kitchen's five daughters, several of whom are referenced to some degree in the record; twins Becky Shaffer and Christy Maciaszek, Karra Vasquez, Sarah, and Katie.  (The record does not reveal Sarah's or Katie's last names.)

[11]Ashley Vasquez was approximately two years old at the time of the alleged attack, while Renee Vasquez was an infant.

her father arrived at Don Shaffer's, Steve Loomis called to her from the top of the stairs that it was time to go home.  (Hr'g Tr. at 306:11-21.)  At that point, Ashlee came up the stairs, and she and her father left for home.  (*Id.*)

## B.  Reporting the Attack

On July 24, 2000, Ashlee and her older sister Kaylee left Cleveland to spend a week with their grandparents in Rochester, New York.  (ECF No. 31, Ex. 10, Direct Appeal Opinion, at 619-20.)  The girls returned home approximately a week later, or slightly longer. (ECF No. 31, Ex. 11, Motion for Leave to File New Trial Motion Instanter, Ex. 11, Trial Tr. at 127:23–128:5.)  After the girls' return, Steve Loomis took them on August 4, 2000 to Don Shaffer's condo, where Kaylee babysat Ashlee, Shaffer and Becky's infant son Aaron, and the two Vasquez girls.  (Trial Tr. at 205:3-10.)  Later that day, Vasquez and Don Shaffer – who worked together at a restaurant in the Flats – arrived home from work together.  (Trial Tr. at 204:18-24.)  Shortly thereafter Ashlee told Shaffer that she needed to talk to him.  (Direct Appeal Opinion, at 620.)  She then proceeded to tell Shaffer that Vasquez had sexually assaulted her by "licking her private spot."  (Trial Tr. at 206:19-20.)

Hearing Ashlee's accusation, Don Shaffer conveyed the information to Steve Loomis, who was his best friend.  (Direct Appeal Opinion, at 618.)  Steve Loomis, in turn, called his partner, Officer Tim Zbikowski, who quickly arrived at the condo.  (Trial Tr. at 134:2-4; 134:22-135:9.)  At that point, Steve Loomis and Zbikowski talked about the allegations with Ashlee.  (*Id.* at 135:12.)  Thereafter 911 was called, and numerous police and emergency personnel arrived.  (Trial Tr. at 209:12-24.)  Ashlee and Steve Loomis, accompanied by Becky Shaffer and her infant son Aaron, went by ambulance to Metro Hospital, where a physical exam

was performed and Ashlee recounted her allegations.  (Hr'g Tr. at 253:14-25, 257:17-25; Trial

Tr. at 141:8-14.)  No DNA evidence was found during the examination or during the

subsequent investigation.

**C.  The Prosecution and Trial**

    **1.  Pre-Trial**

        On August 16, 2000 Vasquez was indicted, and he was arraigned on August 21,

2000.  (ECF No. 31-40, Ex. 26, Notice of Appeal, Cuyahoga App. No. 82156, Trial Docket (the

"Trial Docket").)  Prosecutors charged Vasquez with one count of rape of a child under the age

of thirteen in violation of Ohio Revised Code ("ORC") § 2907.02, and one count of kidnapping

in violation of ORC § 2905.01, with a sexual motivation specification.  (Direct Appeal Opinion,

at 618.)

        Vasquez remained in custody from the time he was arrested.  (See generally, Trial

Docket.)  At the August 21, 2000 arraignment, the trial court declared Vasquez indigent and

appointed Attorney Pat D'Angelo as Vasquez's counsel.  (*Id.*)  Vasquez entered a plea of "Not

Guilty" at the arraignment.  (*Id.*)  D'Angelo moved to withdraw from the case on September 14,

2000, which the court granted.  (*Id.*)  The court then appointed attorney Don Butler to represent

Vasquez on the same day.  (*Id.*)  Butler appeared at the first scheduled pretrial, on September 21,

2000, at which he requested a continuance.  (*Id.*)  The court continued the matter until October

12, 2000, at which point Vasquez made his first appearance in court since he entered his "Not

Guilty" plea on August 21, 2000.  (*Id.*)  An additional pretrial was held on October 19, 2000, at

which Vasquez appeared in court as well.  (*Id.*)  The case proceeded to trial, which commenced

on October 30, 2000, before Cuyahoga County Court of Common Pleas Judge Frank D.

Celebrezze, Jr.  (*Id.*)

### 2.  Trial

The prosecution's case in chief rested entirely on Ashlee Loomis's testimony

about the alleged attack, supported by Steve Loomis's testimony about Ashlee's demeanor in the

time following the alleged incident.  The prosecution also presented a few other witnesses,

including Don Shaffer, Officer Teresa Vega, Sally McHugh ("McHugh"[12]), and Detective James

Chappelle.  These witnesses generally testified about what Ashlee had told them about the

alleged incident, or what they had learned in the course of investigating the case.  Prosecutors

presented no DNA or other physical evidence to support the charges.

Butler's cross-examination of Ashlee Loomis was limited in scope and duration,

and arguably even more damaging than helpful to Vasquez's defense; at one point Butler asked

Ashlee if she kept a diary, to which Ashlee replied that she did.  (Trial Tr. at 98:8-10.)  Ashlee

had not mentioned the diary in her direct examination, and the prosecutor had not offered it as an

exhibit.  Butler then asked whether Ashlee had written about the alleged incident in her diary, to

which Ashlee again answered in the affirmative.  (*Id.* at 98:12-16.)  He pressed on to ask whether

Ashlee had brought the diary to court that day, and Ashlee answered no.  (*Id.* at 98:17-18.)

Butler then concluded his questioning about Ashlee's diary by asking if she still had it, to which

Ashlee answered yes.  (*Id.* at 98:20-21.)  Butler asked no other questions about the diary, nor did

he ever demand to see the diary after learning of its existence.

---

[12]After marrying in the period between trial and the post-conviction hearing, Sally's last name was changed from Weindorf – her surname during the pretrial investigation and trial – to McHugh. For purposes of consistency, the Court will refer to Sally McHugh throughout this Opinion, regardless of the specific point in time being discussed.

After the prosecution rested, Butler did not call a single defense witness, fact or character.  He did not move for a motion *in limine* regarding supposed other allegations of sexual misconduct against Vasquez – vague, unsubstantiated and uninvestigated allegations that the prosecutor had relayed to him, Hr'g Tr. at 139:10-24, – and Vasquez did not testify.  Having heard the prosecution's case – the ten-year-old[13] victim, no physical evidence, a substantial delay in reporting the alleged incident, combined with the improbable circumstances of Vasquez assaulting Ashlee while other adults (including a Cleveland Police Department officer and Vasquez's wife) were upstairs in a tiny home and two other young children were in the same room – Butler renewed his Criminal Rule 29 motion, and then rested his defense at approximately 10:10 a.m. on Thursday, November 2, 2000.  (Trial Tr. 293:7-14.)

Closing arguments and the Charge of the Court followed.  (Trial Tr. at 2.)  The jury was excused to deliberate around lunch time.  (See *id.* at 370:12-17.)  By the start of the "Thursday Afternoon Session" on the same day, *id.* at 371:1, the jury returned a guilty verdict on both counts.  (*Id.* at 371:21–373:15.)  A sexual offender hearing and sentencing followed on December 18, 2000.  (Trial Tr. at 389:6-8; ECF No. 31-4, Ex. 3, Judgment Entry.)

---

[13]Ashlee was nine years old at the time of the alleged incident, but ten years old at the time of trial.

-12-

### D. Post-Conviction Hearing

During the May 14-17, 2002 post-conviction hearing, Vasquez presented affidavits and corresponding testimony from several individuals.  The critical testimony is as follows.

### 1. Don Butler's Post-Conviction Hearing Testimony

Butler testified and described his efforts representing Vasquez.  Butler testified that he was assigned to the case on September 14, 2000.  (Hr'g Tr. at 89:4-8.)  Butler testified that he was "pretty sure" he talked with Vasquez in a holding cell following a pretrial on September 14, 2000.  (Hr'g Tr. 90:22-23.)  He had no notes in his case file, however, to verify that he did, in fact, meet with Vasquez that day.[14]  (Hr'g Tr. 93:21-25; 94:1-12.)  He further testified that he met with Vasquez on at least three occasions.  First, Butler testified that he met with Vasquez on October 12, 2000, in a holding cell after a pretrial conference, for between 12 and 25 minutes.  (Hr'g Tr. 109:24-25–110:1-12; 349:7-14.).  Second, Butler further testified that he met with his client on October 19, 2000, again in a holding cell after a pretrial conference, for about the same duration.  (Hr'g Tr. 112:11-13; 350:18-24.)  Third, Butler testified to meeting with Vasquez for another brief meeting on October 29, 2000, the night before trial, at Jail Number One.  (Hr'g Tr. 121:23-25–122:1-10; 352:20-25–353:1-5.)

Butler also testified that he did some amount of pretrial preparation, such as legal research on child rape cases, Hr'g Tr. 103:4-15, filing standard discovery requests, Hr'g Tr. 100:6-16, and conferencing informally with the initial prosecutor,[15] Hr'g Tr. 92:13-19;

---

[14]Indeed, the state court docket reveals that Vasquez did not appear in court on September 14, 2000.

[15]Attorney Kestra Smith was the prosecutor during the pre-trial investigation.  The docket reflects that Attorney Lynn Travis prosecuted the case at trial.  (ECF No. 31-5, Ex. 4, Notice of Appeal, docket.)

110:16–111:2.  Butler further testified that he requested that Vasquez sign a speedy trial waiver on two occasions, the first during the October 19, 2000 conference, and again during the brief meeting on October 29, 2000.[16]  *Id.* at 350:25–351:23.  Notwithstanding Vasquez's refusal to sign the speedy trial waiver, Butler testified that he was prepared to try the case when the October 30, 2000 trial commenced.[17]  (Hr'g Tr. 125:9.)  According to Butler's affidavit and supporting testimony, he made a professional judgment that there were no helpful witnesses for him to present at trial.  (See Hr'g Tr. 125:9-15.)

Related to his investigation of the case, Butler testified that at some point Vasquez provided him with the name and phone number for Kitchen, Vasquez's mother-in-law.[18] According to Butler's testimony, Vasquez asked him to speak to Kitchen, as Kitchen would be able to provide Butler with the contact information for Karra Vasquez, from whom Butler could learn additional information about the case.  (Hr'g Tr. 116:1-2, 13-16.)  Butler testified that he subsequently telephoned Kitchen.  (Hr'g Tr. at 116:19-20.)  In Butler's version of the events as recounted at the hearing, Kitchen emphatically told him that no one from her family would help Butler with Vasquez's defense, and that the family would do everything they could to make sure Vasquez stayed away from Karra.  (Hr'g Tr. 116:19-24, 117:10-19.)  Butler conceded, however,

---

[16]Butler testified that he did not discuss speedy trial issues with Vasquez during the October 12, 2000 meeting.  (Hr'g Tr. 112:14-17.)

[17]This testimony makes Vasquez's refusal to sign a speedy trial waiver irrelevant.

[18]The record is unclear exactly how and when Butler received Kitchen's name and phone number. Vasquez did not explicitly state in his post-conviction hearing testimony how or when he conveyed the information to Butler, although he testified that he gave Butler two ten-page handwritten letters containing information for Butler to investigate further. (Hr'g Tr. 349.) Butler similarly testified that Vasquez provided him with the information, but it is unclear whether the information was conveyed via the letters or orally. (See Hr'g Tr. 115-116.)  To further complicate matters, Butler testified that he received the information "when I think I went up in the jail," Hr'g Tr. 116:13-16, but the uncontested facts are that Butler only visited Vasquez at "the jail" on the night before trial, October 29, 2000.

-14-

that he did not make any contemporaneous notes of the conversation.  (Hr'g Tr. at 119:21–120:2.)

Butler also conceded in his testimony that he did not talk with Karra Vasquez, nor did he make any attempts to contact Karra beyond his singular telephone conversation with Kitchen.  (Hr'g Tr. 118:8–119:2.)  Butler denied that Karra Vasquez called him.  (*Id.*)

Additionally, Butler testified that although he stated in his affidavit that it was his professional judgment that Becky Shaffer would not be a helpful witness, he did not actually talk with Becky, nor did he make any attempt to contact her.  (Hr'g Tr. 121:2-4, 15-17.) Furthermore, he testified that he did not know about or speak with Tammy Salopek or her daughters, including Ashley Snyder.  (*Id.* at 125:16–126:2.)

Finally, Butler testified that he did not have any documentary evidence to substantiate the vague allegations of other child abuse charges to which the prosecutor had referred in some meetings with Butler.  (Hr'g Tr. at 139:10-24.)  He also testified that he had no notes of any of his conversations with his client or with either of the prosecutors.  (See, e.g., Hr'g Tr. at 93:21–94:12; 123:22–124:3; 124:15-20; 109:16-23; 112:2-6.)

Subsequent witness testimony explicitly and directly contradicted Butler's testimony on a number of critical points.

### 2.  Karra Vasquez's Post-Conviction Hearing Testimony

#### a.  Testimony about the investigation

Karra Vasquez gave specific testimony about numerous phone calls not only to Butler but to Attorney D'Angelo as well, calls that went unreturned.  (Hr'g Tr. at 321:1-18.) Karra emphatically disputed Butler's testimony that she never contacted him, detailing her

numerous attempts to talk with him about the case.  (See generally, Hr'g Tr. at 321-322.)  Karra testified that she made repeated phone calls to Butler's office to speak with him about Vasquez's case, but "he was never there."  *Id.* at 321:15-18.  She testified that she left her name, telephone number, and reason for calling with Butler's secretary, and was told that Butler would call her back.  *Id.*  Butler, according to Karra's testimony, never returned her calls.  *Id.* at 322:16-17.

Karra Vasquez further testified that she attempted to help Vasquez initially, but that she did not attend the trial or sentencing because she felt threatened by social worker McHugh.  (See Hr'g Tr. at 335:12-20; 329:8-15; 318:4–320:19.)  According to Karra's testimony, McHugh threatened to remove Karra's children on grounds of child negligence if Karra persisted in believing that her husband was innocent and in helping his defense.  (Hr'g Tr. at 318:4–320:19.)

### b.  Testimony about the underlying events

In addition to testifying about the investigation, Karra Vasquez also testified about personal observations from the nights of July 23, 2000 and August 4, 2000.  Her testimony stands in contrast with that offered by witnesses at trial.

First and most critically, Karra specifically testified that she observed that Ashlee was wearing a bathing suit on the night of July 23, 2000:

| Question: | As you reflect on what you observed that night, did you notice anything about, number one, her clothing? |
| Answer: | She was wearing a swim suit. |
| Question: | Did the swim suit or any other attire appear to be disheveled? |
| Answer: | No. |

(Hr'g Tr. at 306:1-5.)  Conversely, Ashlee testified at trial[19] – and told others who then recounted

_____

[19]Ashlee did not testify at the post-conviction hearing, nor did her father Steve Loomis.

-16-

that same telling at trial – that Vasquez "pulled down my pants and underwear" before allegedly

licking her vagina.  (Trial Tr. at 41:5-7, 42:3-4.)  Furthermore, Ashlee testified that when her

father called from the top of the stairs to tell her it was time to leave, she "pulled my underwear

and pants back up" and went back upstairs.  (*Id.* at 48:3-4.)  Steve Loomis testified at trial that

Ashlee had told him that Vasquez "took her pants – her shorts and her panties off" and that when

her father called from the top of the stairs, Ashlee "pulled her clothes on."  (Trial Tr. at 170:8-9,

16-17.)

            Second, and just as critically, Karra testified that Ashlee

> actually went down [to the basement] twice.  She went down the first time for just
> a few minutes.  Came back up.  And then she went down the second time, and I
> could hear that they were changing Renee's diaper, getting the kids ready for bed.
> And then Steve said that it was time to go and he yelled down the steps and said
> Ashlee, it is time to go.  She came running up the steps, because her dad called her,
> it was time to go, and they left.

(Hr'g Tr. 306:11-21.)

            Karra Vasquez's testimony again explicitly contradicts Ashlee's account of the

events that night; Ashlee testified at trial that she went down to the basement at Vasquez's

invitation, she crawled up on the top bunk, he held her down and molested her, and only let her

go when her father called her from the top of the stairs to say it was time to go.  (See generally

Trial Tr. 38-48.).  Steve Loomis's testimony does nothing to bolster either side, as he testified

that he did not actually observe Ashlee from the time he left her to eat her fast food in the living

room until the time when he called to her from the top of the steps, because he had gone outside

to talk with Karra Vasquez.  (Trial Tr. 124:24–125:11.)

Third, Karra Vasquez testified that she, her husband, and their two daughters had just moved into Don Shaffer's basement on July 23, 2000, the night the alleged incident occurred.  (Hr'g Tr. 306:24–307:10.)

Karra Vasquez's testimony conflicts with the version of events to which Ashlee previously testified.  Ashlee testified that she met Vasquez for the first time at a family gathering at Kitchen's house.  (Trial Tr. at 76:6-25.)  Ashlee then testified that the second time she met Vasquez was at Don and Becky Shaffer's place, and that Vasquez, Karra Vasquez, and their two daughters had moved in to the Shaffer residence at the time.  (Trial Tr. at 78:17–79:5.) According to Ashlee, nothing happened with Vasquez on that second occasion (which, according to the otherwise-undisputed testimony, was the day Vasquez and his family moved in):

| | |
|---|---|
| Question: | Now, when you saw them the second time, which was at Don's and Becky's house, did anything happen on that occasion? |
| Answer: | That occasion, no. |
| Question: | Beg your pardon? |
| Answer: | No. |
| Question: | All right.  And did Rob speak to you? |
| Answer: | No. |
| Question: | He didn't say hi? |
| Answer: | He said hi. |
| Question: | All right.  Did you say hi? |
| Answer: | Yes. |
| Question: | All right.   And did he ask you go anyplace with him on that occasion? |
| Answer: | No. |

(Trial Tr. at 79:7-24.)  This testimony contradicts the testimony that the alleged attack happened on the day that Vasquez and his family moved into Don Shaffer's basement.

Fourth, Karra testified that Vasquez took their two young children down to the basement at around the same time Don Shaffer and Becky went upstairs to bed.  (Hr'g Tr. 302:17-22.)  Thus, Karra Vasquez testified, she was the only person upstairs (i.e. in the

-18-

kitchen/living room area) when Ashlee and Steve Loomis arrived to eat.  (See Trial Tr. 303:8-14.)  She testified that Vasquez was already in the basement with their children when the Loomises arrived.  (*See id.*)  According to Karra, Ashlee "was up with us [i.e Karra and Steve] and we were talking, and she said she wanted to see the kids, so she ran down to the basement. She was down there for maybe five minutes and came back up."  (*Id.* at 305:22-25.)

Conversely, Ashlee alternately testified that "just Don [Shaffer]" was awake when she and her father arrived at the condo to eat, Trial Tr. 33:5-7; 90:6-8; that she saw Vasquez when she arrived at Don Shaffer's, Trial Tr. 33:9-11, 25; 34:1-2; and that when she arrived at the condo with her father, "Karra was on the couch watching T.V. with Rob[ert]," 92:18-25.[20] Ashlee also testified that Vasquez asked her to go down to the basement with him when Karra Vasquez and Steve Loomis began talking.  (See Trial Tr. 36:12-15; 38:9-13.)

Karra Vasquez's testimony similarly conflicts with Steve Loomis's testimony about that night; he testified at trial that Vasquez was in the kitchen when Ashlee and Steve arrived, and that he "saw Rob go down into the basement."  (Trial Tr. 124:1-2; 125:5.)

Fifth, Karra Vasquez testified that she heard conversation between Ashlee and Steve Loomis on the night Ashlee reported the alleged attack.  Karra Vasquez testified that she was standing inside the screen door, while Ashlee and Steve were "standing right on the stoop"

---

[20]The direct appeal court found that "Shaffer and Becky had retired for the night [by the time Ashlee and Steve Loomis arrived at Don Shaffer's condo]."  (Direct Appeal Opinion, at 619.)  Of the six persons who were able to testify about the night of July 23, 2000, adults Don Shaffer, Becky Shaffer, Karra Vasquez, Robert Vasquez, and Steve Loomis all confirmed whether in trial or post-conviction hearing testimony that Don Shaffer and Becky Shaffer had gone to bed by the time the Loomises arrived.  Ashlee, on the other hand, gave internally and externally inconsistent testimony about who she observed upon arriving at Shaffer's condo

The direct appeal court also found that "the victim and her father proceeded to join [Vasquez, Karra, and their two small children] in eating the fast food."  (*Id.*)  There is nothing in any of the testimony, however, that supports the appeals court's finding that both families sat and ate together.

-19-

outside the door.  (Hr'g Tr. 110:1-4.)  According to Karra Vasquez, Steve Loomis asked Ashlee

specific questions while she was recounting the alleged attack, such as when and how the

incident happened, and how long did it take.  (Hr'g Tr. 315:5-11.)  Ashlee's initial response,

Karra Vasquez testified, was that the incident took four episodes of Rugrats, which was two

hours, to which Steve Loomis responded "that's too long.  It couldn't have been two hours.  You

need to really think about this."  (Hr'g Tr. 315:12-16.)  Karra Vasquez further testified that Steve

and his partner [Officer Zbikowski, who was not officially on duty at the time] were telling

Ashlee that "you have to get this right.  You have to make sure that you know exactly what you

are going to say and repeat this to every person that asks you.  You can't change your mind."

(Hr'g Tr. 315:21–316:1.)

   Sixth, Karra Vasquez testified that while she was at the front screen door listening

to Ashlee talk with her father and Officer Zbikowski, Ashlee "kept responding as – well, does

this mean I get to be on TV?  If I tell them this do I get to be on TV.  And she was laughing,

giggling."  (Hr'g Tr. 316:2-4.)

### 3.  Becky Shaffer's Post-Conviction Hearing Testimony

   Like Karra Vasquez, Becky Shaffer was present on the night of the alleged

incident, although she was asleep at the time.  She was also present for many of the events that

occurred on the night of August 4, 2000.  Yet Becky, like Karra Vasquez, was not called as a

witness at the trial.[21]  The critical portions of her testimony are as follows.

### a.  Testimony about the investigation

Becky Shaffer testified that Butler never talked with her to see what she might

have to say.  (Hr'g Tr. 262:21-22; 288:25–289:5.)  She also testified that she received a

subpoena from the prosecution to testify at trial, that she was in the courthouse all three days of

the trial, and that she did not end up testifying at the trial.[22]  (Hr'g Tr. at 262:23–265:7.)

### b.  Testimony about the underlying events

First, Becky Shaffer testified that she and her infant son Aaron rode with Ashlee

and Steve Loomis in the ambulance on August 4, 2000.  (Hr'g Tr. 253:14-25.)  According to

Becky's testimony, Ashlee appeared excited by the attention she was receiving during the ride to

the hospital.  (*Id.* at 255:8-12.  Moreover, Becky specifically testified that "Ashlee asked if she

was going to be on TV" while she was being attended in the back of the ambulance.  (*Id.* at

255:22.  See also, 256:7-8.)  Becky testified that she found this statement "odd because Ashlee

craved attention.  And that is why - - and that's why some of this didn't sit well with some of the

things that went on."  (Hr'g Tr. at 266:3-11.)  Becky was not questioned about the statement on

cross-examination.  This testimony echoes Karra Vasquez's testimony that Ashlee made the

---

[21]Becky Shaffer was subpoenaed to testify as a prosecution witness, as her husband Don did.

[22]Becky Shaffer also testified that the prosecutor told her to leave the courthouse on the third day of trial, after learning that Becky might have potentially damaging information about Steve Loomis, because prosecutors "said they didn't want Don Butler to see me."  (Hr'g Tr. at 264:17-21.)  This testimony, if true, might well demonstrate suppression of a witness by the prosecution, which the Court finds unsettling to say the least.

same statements about getting on TV while talking with her father and standing outside the door at the condo.

Second, Becky Shaffer testified that Vasquez, Karra Vasquez and their children had just moved into Don Shaffer's basement on July 23, 2000. (Hr'g Tr. 243:12-13.) This testimony reconfirms Karra Vasquez's testimony, and similarly conflicts with Ashlee's trial testimony that nothing happened on the day the Vasquez family moved into Don Shaffer's basement.

Third, Becky Shaffer testified that on the night of July 23, 2000 she and Don had gone upstairs to bed before Ashlee and Steve Loomis arrived at the condo. (Hr'g Tr. at 246:10-16.) She further testified that she was at work on the night of August 4, 2000 and came home in response to a phone call. (Hr'g Tr. at 249:1-20.)

This contradicts Ashlee's testimony that on the night of the alleged attack (July 23, 2000), Becky was at work and that Becky came home when Ashlee was in the ambulance. During direct examination about what happened on the night of July 23, 2000, Ashlee testified as follows:

> Question:   Where was Becky?
> Answer:     Becky was at work.
> Question:   She was at work?
> Answer:     Yeah.
> Question:   Okay.  She wasn't in bed?
> Answer.     No.
>
>     * * *

| | |
|---|---|
| Question: | And you say Becky was at work? |
| Answer: | Yes. |
| Question: | How do you know Becky was at work? |
| Answer: | Because when I was in the ambulance she came home, so that's how I know. |
| Question: | She came home from work? |
| Answer: | Yes. |
| Question: | Well, wait a minute.  I'm not talking about the time - - I'm not talking about when you told Uncle Don [Shaffer] what happened.  I'm talking about when you went there and you had Burger Kings [sic]. |
| Answer: | I know. |
| Question: | All right.  I'm talking about when you say Rob touched your private part, where was Becky on that day? |
| Answer: | At work. |
| Question: | July 23rd? |
| Answer: | At work. |

(See Trial Tr. at 91:9–92:2.)

Fourth, Becky Shaffer testified that she took her son Aaron to the hospital on the night of August 4, 2000, because Steve Loomis and "the other police officer" [Zbikowski] told her to do so, Hr'g Tr. 272:8-16, not because she suspected or was concerned that Vasquez had sexually abused Aaron.  (See Hr'g Tr. 271:24–272:16; 273:1–274:15.)[23]

Fifth, Becky Shaffer testified that she had talked to the prosecutor about her concern regarding a conversation between Becky and Sally McHugh, during which conversation McHugh told Becky that she [McHugh] might be taking Karra Vasquez's children away.  (Hr'g Tr. 293:8-11.)

---

[23]Curiously, the court at the post-conviction hearing found that Becky Shaffer "admitted that she reported to the hospital that she had come in with Ashlee Loomis, who reported that she was raped by Robert Vasquez, who lived in Shaffer's home and that she wanted to see if her son had also been abused." (Post–conviction Hearing Findings, at 16.)  A closer analysis of Becky's testimony, however, makes this finding a significant stretch, if not an outright mischaracterization.  This is especially so when considering the convoluted cross-examination questioning involving multi-part questions that elicited a "yes" and Becky's repeated testimony that she only took her son in the ambulance because Steve Loomis and another police officer directed her to do so.

### 4.  Joanne Kitchen's Post-Conviction Hearing Testimony

Joanne Kitchen also testified at the post-conviction hearing.  Although she was not present in the Shaffer home on either July 23, 2000 or August 4, 2000, she testified about her conversation with Don Butler.  She was also present when social worker McHugh interviewed Karra Vasquez, and her testimony shed additional light on why Karra Vasquez did not play a more active role in Vasquez's defense.  Additionally, Kitchen testified about her personal observations of Ashlee's desire for attention.  Her critical testimony is as follows.

#### a.  Testimony about the investigation

First, Kitchen did not contest Butler's testimony that he telephoned Kitchen.  (See Hr'g Tr. 116:19-20; 203:10-13.)  Kitchen's testimony, however, hotly disputed the substance of that conversation as Butler recounted in his testimony.  Kitchen testified that she only told Butler that she was not present on the night of the alleged attack and didn't know what went on that night.  (Hr'g Tr. 204:19-23.)

Kitchen also testified to the following: (1) that she never told Butler that none of her family would help him defend Vasquez (Hr'g Tr. 204:24-25–205:1-10.); (2) that she never told Butler that she and her family would do everything they could to make sure Vasquez stayed in jail (*Id.* at 205:11-14.); and (3) that she never told Butler that she and her family would not cooperate in defending Vasquez (*Id.* at 205:15-18.).  According to Kitchen, the telephone call lasted only two to three minutes.  (*Id.* at 205:19-21.)  Kitchen also testified that Butler never contacted her again.  (*Id.* at 206:1-3.)

Second, Kitchen testified that McHugh indicated that the Department of Human Services would take action against Karra Vasquez regarding her children if Karra cooperated

-24-

with Vasquez's defense.  (Hr'g Tr. 202:2-6, 12-18.)  According to Kitchen, McHugh stated that she would investigate if Karra Vasquez could keep the children, if Karra Vasquez was a fit mother, and that there was a possibility of putting Karra Vasquez's children in foster care.  (*Id.* at 203:1-4.)  While Kitchen declined on a few occasions to use the word "threatened" to describe McHugh's statements to Karra Vasquez about the children, the following exchange occurred during cross-examination:

| | |
|---|---|
| Question: | [Y]our testimony this morning was that you didn't think that the social worker threatened Karra, is that correct?  Is that what you said this morning? |
| Answer: | I said I didn't like the word threatened. |
| Question: | So you didn't think that the social worker said anything that was threatening or that she made no threat? |
| Answer: | Well, she did. |
| Question: | Well, she did or she didn't? |
| Answer: | She did.  Well, not - - |
| Question: | Is it a threat or wasn't it? |
| Answer: | I don't like you using the term threatened.  I mean, that's a strong word. |
| The Court: | Let me ask a question: You were present during the conversation between Ms. [McHugh] and your daughter? |
| Answer: | Yes. |
| The Court: | Putting yourself in your daughter's [Karra's] shoes, would you have felt threatened by [McHugh's] statement?" |
| Answer: | Yes. |
| The Court: | Okay.  Thank you. |

(Hr'g Tr. 213:16–214:16).

### b. Testimony about observations of Ashlee Loomis

Kitchen testified that Steve Loomis dated her daughter Christy for "a couple years."  (Hr'g Tr. 208:4-6.)  Accordingly, Kitchen testified, she observed Ashlee on several occasions and interacted with the girl at various "family functions" to the point where Ashlee called Kitchen "Grandma."  (Hr'g Tr. 193:11-23; 208:7-10.)  Kitchen testified, based on her

-25-

observations, that Ashlee was starved for attention without a mother in the home, and that "whatever was going on [Ashlee] had to . . . do one step better, or whatever the story was or whatever was going on, it had to be worse . . . that kind of thing." (*Id.* at 195:21-24.)

### 5. Tammy Salopek's Post-Conviction Hearing Testimony

Tammy Salopek testified on Vasquez's behalf. Importantly, Salopek provided compelling testimony about Ashlee's character for truthfulness. Her testimony also directly contradicted Steve Loomis's testimony in some critical aspects.

Salopek testified that she was good friends with Becky Shaffer, and that Salopek, Becky and Don Shaffer, and Steve Loomis were all part of a group that frequently socialized together. (Hr'g Tr. 143:18-25.) Salopek testified that she had a close relationship with Steve Loomis as a result of working with him for several years. (Hr'g Tr. at 143:9-22.) Salopek recounted that Steve Loomis's children – Ashlee and Kaylee – would play with her own children of approximately the same age, Hr'g Tr. at 145:6-8; that Ashlee and Kaylee would stay over, and sleep over, at her house "a lot," *id.* at 144:13–145:5; and that Ashlee was at Salopek's house "on average two, three times a week" during the summer of 2000, *id.* at 144:13-17. Conversely, she testified that she did not know Vasquez, that he was not a friend of hers, and that she had never seen him before. (Hr'g Tr. 155:17-23.)

Salopek also testified that her own children had been sexually molested by their step-grandfather, who was prosecuted but plea-bargained because Salopek did not want her children to testify.  (Post-Conviction Hearing Findings, at 17 (citing Hr'g Tr. at 151).)

### a.  Testimony about Ashlee Loomis's character for truthfulness

Tammy Salopek testified to her observations of Ashlee Loomis's character for truthfulness based on her observations of the girl.  Salopek testified that she had ample occasion in her role as a caretaker to observe Ashlee.  (*Id.* at 145:13-15.)  When asked on direct examination about her parental perspective of Ashlee, Salopek described Ashlee by testifying that "she seeks attention a lot.  She is a little, kind of like a little drama queen."  (*Id.* at 147:6-8.)  Further testimony was as follows:

> Question:  [A]s a result of your interaction with [Ashlee], do you have an opinion as to the character of this child for trustworthiness and honesty?
> Answer:  Ashlee would – Ashlee would overexaggerate a lot of things.  I caught Ashlee lying to me a few times, on a few occasions.  I would say no.
> Question:  What do you mean you would say no?
> Answer:  I would say no, she is not extremely trustworthy.  I wouldn't take anything that Ashlee would come and tell me on Ashlee's word.
> Question:  Tell me why.
> Answer:  I would have to go investigate it.  Because generally that's not the way things happened and that's not what ended up happening.
>   We had incidents.  She had told me one time flat out.  I think she hit Brandy, my daughter.  And I mean, I saw her.  I heard her.  There was a mark on Brandy.  And I flat out asked her why she did that, and she swore up and down she didn't do that.  So stuff like that.
> Question:  Is it more than just one occasion?
> Answer:  Yeah. . . .

(*Id.* at (Hr'g Tr. 147:2–148:18.)  Salopek further testified at length about how she did not trust Ashlee, that Ashlee "overexaggerates things," and that Ashlee was "never truthful."  (See generally Hr'g Tr. 149-150:8.)

-27-

Moreover, Salopek testified that Ashlee craved attention, and that "[s]he is very, very melodramatic, very manipulative as far as her father is concerned. . . . she has got Steve right where she wants Steve." (*Id.* at 150:9-21.)  The extent to which Ashlee craved attention, according to Salopek, was unique to Ashlee as compared to attention-seeking by other children. (*Id.* at 151:5-14.)  Salopek additionally testified that she would not blame anybody for anything that Ashlee told her, because Ashlee "is just not believable all the time.  She just wasn't." (*Id.* at 158:1-10.)

### b.  Testimony about Ashlee's demeanor following the reported allegations

Salopek testified about Ashlee's behavior in the days following August 4, 2000. According to Salopek, Steve Loomis called and told her about the accusation lodged by Ashlee on Friday, August 4, 2000, and Ashlee stayed at Salopek's house the next three or four days. (Post-conviction Hearing Findings, at 17.)  During that time, Salopek testified, Ashlee had no trouble sleeping or eating, she acted normally, had no emotional outbursts, and in general showed no behavior that was cause for concern.  (Hr'g Tr. 155:2-16.)

Critically, Salopek's testimony about Ashlee's behavior following August 4, 2000 directly contradicts Steve Loomis's trial testimony as follows:

Question:    Now, following the disclosure to you of this incident, did Ashlee exhibit any unusual conduct?  Let's start with the days immediately following.

Answer:    Um, yes, ma'am.  She, um, she woke up several times throughout the course of the night, um, complaining of dreams, bad dreams. Um, she wanted to know if Rob was in jail.  She was afraid that he was coming over.  We had to, um - - subsequently, we had to walk around the house and make sure all the doors and windows were locked.  We had to insure [sic] that Sammy, who's our black Lab. was in the house.  She was terrified.

| Question: | Now, in the days, let's say, in the immediate, you know, week following the disclosure to you, was she able to sleep by herself through the night - - |
|---|---|
| Answer: | Yes, ma'am. |
| Question: | - - in the days immediately following this? |
| Answer: | No, not immediately following this, but it's gotten better since.  Um, she's only waking up occasionally, now. |
| Question: | Was she able to sleep by herself immediately following this disclosure? |
| Answer: | No, ma'am. |

(Trial Tr. at 141:22–142:19.)

### 6.  Ashley Snyder's Post-Conviction Hearing Testimony

Ashley Snyder, who is Tammy Salopek's daughter, is about the same age as Kaylee Loomis (Ashlee's older sister).  Snyder testified that she knows Ashlee Loomis well, though she is better friends with Kaylee because Snyder and Kaylee are closer in age.  (Hr'g Tr. 167-168.)  Snyder also testified that she had discussed with Kaylee the circumstances of Snyder's (and her sister's) sexual molestation at the hands of Snyder's step-grandfather.  (*Id.* at 168:17–169:3.)  Snyder testified that she believed (but was not sure) that Ashlee Loomis was present during the discussion about the sexual molestation.  (*Id.* at 169:3-4.)

Moreover, Snyder testified that she believed, based on past experiences with Ashlee Loomis, that Ashlee told lots of stories, would "lie right to my face," and that "she did that very often."  (*Id.* at 170:19–171:4.)  Finally, Snyder, like her mother, testified that Ashlee Loomis had spent three to four nights sleeping over at Snyder's house in August of 2000, and that Ashlee did not exhibit any problems, unusual behavior, or crying while staying sleeping over.  (Hr'g Tr. at 171:15–172:3.)

-29-

### 7.  Vasquez's Post-Conviction Hearing Testimony

Vasquez testified on his own behalf at the post-conviction hearing, and his testimony contradicted Ashlee's and Steve Loomis's testimony – and supported Karra Vasquez's testimony – in some key places.  Vasquez's testimony also disputed Butler's testimony in some respects.

### a.  Testimony about the investigation

Vasquez testified that he had no pretrial on September 14, 2000, and that he did not meet with Butler on that day, Hr'g Tr. 348:19-25, testimony that is verified by the trial court's docket entry for that day.  According to Vasquez's testimony, the first time he met with Butler was on October 12, 2000, *id.* at 348:7-11, which contradicts Butler's testimony that Butler met with his client in a holding cell on September 14, 2000.

Vasquez also testified that Butler never discussed any other allegations of sexual misconduct against Vasquez.  (Hr'g Tr. at 377-78.)  On the other hand, Vasquez testified that Butler <u>did</u> discuss drug and trespassing charges from Nevada, and that it was Vasquez's understanding that Butler advised Vasquez not to testify at trial based on the two Nevada misdemeanors.  (Hr'g Tr. at 376:7-10.)

### b.  Testimony about the underlying events

Vasquez testified that he did not see Steve Loomis on the night of July 23, 2000 and that he had no contact with Steve Loomis that night.  (Hr'g Tr. 342:21-24; 343:17-19.)  According to Vasquez's testimony, he was already in the basement taking care of his two daughters when the Loomises arrived at Don Shaffer's condo.  (*Id.* at 342:24–343:1.)  Vasquez testified that he was downstairs "changing my daughters, and then Ashlee Loomis came

downstairs for five minutes.  She went upstairs, then she came back downstairs, and then they left."  (*Id.* at 343:8-11.)  He similarly testified that Ashlee and Steve Loomis arrived "between 10:30 and 11:00," and that they stayed for approximately 15-20 minutes.  (*Id.* at 343:4-13.)  Vasquez also denied that he licked Ashlee's vagina.  (*Id.* at 343:23-25.)

Vasquez's post-conviction hearing testimony conflicts in several instances with the version of events from July 23, 2000 that Ashlee and Steve Loomis provided at trial.  On the other hand, Vasquez's version of events is essentially the same version to which Karra Vasquez testified.

### III.  LAW AND ANALYSIS

**A.  AEDPA Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Vasquez's habeas Petition because he filed his Petition after the April 24, 1996 effective date of the statute.  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (relevant portions codified as amended at 28 U.S.C. § 2254[24] (2000)); *Williams v. Taylor*, 529 U.S. 362, 402 (2000); *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).

---

[24]Unless otherwise noted, all references to sections of the United States Code are to Title 28.

Federal courts examine a habeas petition filed by a prisoner in custody pursuant to a state court judgment as circumscribed by AEDPA, and specifically in this case under § 2254(d).  Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ only if the state court decision was based on a conclusion of law opposite to that reached in Supreme Court precedent.  *Ramonez v. Berghuis*, 490 F.3d 482, 486 (6th Cir. 2007) (*citing Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006)).  *See also*, *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) ("A state-court decision is considered 'contrary to . . . clearly established Federal law' if it is 'diametrically different, opposite in character or nature, or mutually opposed.'") (*quoting  Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted)).

Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Ramonez*, 490 F.3d at 486 (alterations included in original) (*citing Williams*, 529 U.S. at 413).  To issue a writ on that ground, "the federal court must find the state court's application of Supreme Court precedent 'objectively unreasonable,' not merely 'incorrect or erroneous.'" *Id.* (*citing Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)).  The federal habeas court must also

-32-

presume that state court factual determinations are correct, unless the petitioner can demonstrate any state court error by clear and convincing evidence.  *Id.*

   The right to counsel guaranteed by the Sixth Amendment is the right to <u>effective</u> assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  *Strickland v. Washington*, 466 U.S. 668 (1984) represents clearly established federal law as determined by the United States Supreme Court and applies to a habeas petitioner's claims of ineffective assistance of counsel.  *See Williams*, 529 U.S. at 390.  Vasquez seeks federal habeas relief from his state court conviction.  Thus, in order for Vasquez to be entitled to habeas relief under AEDPA, he must show that the Ohio Court of Appeals reached a decision that was contrary to, or unreasonably applied, the *Strickland* standard as to trial counsel's performance and in determining whether there was any prejudice to Vasquez's defense.  *See, e.g.*, *Smith v. Lafler*, 175 Fed. App. 1, 4 (6th Cir. March 15, 2006).

   Under *Strickland*, an ineffective assistance of counsel claim has two elements; to prevail, a petitioner must establish that both (1) the defense counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced the defense sufficiently to undermine the reliability of the trial.  *Ramonez*, 490 F.3d at 486 (*citing Strickland*, 466 U.S. at 687).

   The first *Strickland* element – the so-called "performance" element – requires Vasquez to "show that counsel's representation fell below an objective standard of reasonableness."  *Id.* (*citing Strickland*, 466 U.S. at 688).  The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [a petitioner] must overcome the presumption that, under the circumstances,

-33-

the challenged conduct might be considered sound strategy." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (*quoting Strickland*, 466 U.S. at 689).

The second *Strickland* element – the so-called "prejudice" element – requires that a habeas petitioner demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Ramonez*, 490 F.3d at 487 (*quoting Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000)); *see also*, *Towns*, 395 F.3d at 258 (*citing Combs*, 205 F.3d at 278).  Thus, these findings "are not findings of historical facts that are subject to the § 2254(e)(1) presumption of correctness for state court factual findings." *Ramonez*, 490 F.3d at 487 (*quoting McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000)).

## B.  Vasquez's Grounds For Relief

Vasquez presents four grounds for relief, all of which argue that Attorney Donald Butler rendered constitutionally ineffective counsel.  (ECF No. 1.)  As recounted above, the Court has already found ground (3) to be procedurally defaulted.  Additionally, the Court finds that ground (4) is also procedurally defaulted.  The claim was raised on direct review and again on post-conviction relief, but was not initially brought before the highest court of the state on direct review.  After Vasquez filed a motion for leave to file a delayed appeal in the Ohio Supreme Court, that court denied the motion.  The Sixth Circuit has found that the denial of a motion for leave to file a delayed appeal by the Ohio Supreme Court constitutes a procedural ruling sufficient to bar review in this Court. *Bonilla v. Hurley*, 370 F.3d 494 (6th Cir. 2004);

-34-

*Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431-32 (6th Cir. 2006).  The Ohio

Supreme Court denied Vasquez's motion for leave to file a delayed appeal on ground (4), and

thus ground (4) is also procedurally defaulted.

        Grounds (1) and (2), however, are exhausted, not procedurally defaulted, and are

ripe for review by the Court.

    **1.  The State Court's Conclusions Were An Unreasonable Application of *Strickland***

        Vasquez alleges in his first and second grounds for relief that he received

ineffective assistance of counsel when Butler failed to adequately meet and discuss the charges,

only met with Vasquez three times in sessions of 15-20 minutes each, and failed to adequately

investigate the case and interview potential witnesses.  (ECF No. 1 at ¶¶ 12(A)-(B).)  The state

appeals court reviewed the testimony from the post-conviction hearing, and affirmed the trial

court's denial of post-conviction relief.  (ECF No. 31-53, Ex. 30.  *See also State v. Vasquez*,

2004 Ohio 53, *P23 (Ohio Ct. App. Jan. 8, 2004).)

        The Court finds that the state court application of *Strickland* in this case was

objectively unreasonable.  The state appeals court's findings – that Butler did prepare for trial,

that he could not be expected to subpoena uncooperative family members, and that none of the

witnesses who testified at the post-conviction hearing would have changed the outcome of the

trial – are so contrary to the evidence adduced during the post-conviction hearing that they are an

unreasonable application of *Strickland*.  The Court is mindful that § 2254(e)(1) presumption of

correctness applies to the findings of fact about Butler's credibility, especially because the

findings were made following a three-day post-conviction hearing.  Nevertheless, the Court finds

that Vasquez has met his burden.  Sadly, in this case his appointed counsel did almost nothing

before or during trial, in a situation where the prosecution's case was weak and Vasquez faced

life imprisonment.

### a.  The Performance Element: Counsel's Performance Was Deficient Because He Failed to Reasonably Investigate the Case

It is well-established that "'counsel has a duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary.'" *Towns*, 395

F.3d at 258 (*citing Strickland*, 466 U.S. at 691).  The duty to investigate derives from counsel's

basic function, which is "to make the adversarial testing process work in the particular case." *Id.*

(*quoting Kimelman v. Morrison*, 477 U.S. 365, 384 (1986) (*in turn quoting Strickland*, 466 U.S.

at 690)).  "Strategic choices made after <u>thorough</u> investigation of law and facts relevant to

plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690 (emphasis added).

Strategic choices made after <u>less</u> than complete investigation are reasonable "precisely to the

extent that reasonable professional judgments support the limitations on investigation." *Id.* at

690-91.  "In other words, counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary." *Id.*  Failing to conduct

pretrial discovery does not excuse this duty, even if counsel's performance at trial is "generally

creditable." *Smith v. Lafler*, 175 Fed. Appx. at *4 (*quoting Kimmelman*, 477 U.S. at 386 (*in turn

quoting Strickland*, 466 U.S. at 690)).

Furthermore, "in any effectiveness case, a particular decision not to investigate

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments." *Id.* at 691.  "The relevant question is not whether

counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528

U.S. 470, 481 (2000).  Critically, the Supreme Court's central teaching of *Strickland*, as

-36-

reaffirmed by *Wiggins*, 539 U.S. at 522-23, is that "the investigation leading to the choice of a so-called trial strategy <u>must itself have been reasonably conducted</u> lest the 'strategic' choice erected upon it rest on a rotten foundation." *Ramonez*, 490 F.3d at 488 (emphasis added).  A "purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Id.* (*quoting Towns*, 395 F.3d at 258 (internal citations omitted)).  Finally, the Sixth Circuit's *Towns* opinion "dispels any doubt that a lawyer's *Strickland* duty 'includes the obligation to investigate <u>all</u> witnesses who may have information concerning his or her client's guilt or innocence.'" *Ramonez*, 490 F.3d at 487 (*quoting Towns*, 395 F.3d at 258) (emphasis added).

Here, Butler's performance as a whole was deficient.  Butler testified at the post-conviction hearing that he did not present any witnesses at trial based on his professional judgments.  But even crediting Butler's assertion that his reasoned professional judgment underlay his trial strategies, the fact still remains that his strategies rested upon a "rotten foundation."  Butler simply failed in his duty to conduct an objectively reasonable investigation on which to base his conclusions about trial strategy, given the weakness of the state's case and the tremendously high stakes his client faced.

### 1.  Witnesses Not Interviewed:

Butler contended that his incomplete investigation was due to non-cooperation from Vasquez's family members.  Yet a single phone call to the mother-in-law of a defendant is hardly a solid foundation upon which to make the "strategic" choice to call nary a defense witness, as was the case here.  As even Butler's testimony demonstrates, the single telephone call to Joanne Kitchen was the full extent of his investigation of any and all potential witnesses.

-37-

Butler never called Kitchen again, nor did he make any other efforts to track down and interview Karra Vasquez, though she was one of the few adults at the condo on the night of July 23, 2000.  Although Don Shaffer and Becky Shaffer were known to Butler (indeed, Don Shaffer was a witness for the prosecution, while Becky had a subpoena to similarly testify), he failed to contact either person to learn what they might say, despite the fact that they, too, were adults physically present in the condo on the night of July 23, 2000.  Furthermore, Butler never made any effort to contact Salopek or her daughter Snyder; he did not even know of their existence because he failed to interview Becky Shaffer.

Even if Kitchen did say that she would not give Butler the telephone number for Karra Vasquez, as he testified, or tell Butler that no one in the family would cooperate with him – testimony that Kitchen herself flatly disputed under oath[25] – the fact remains that he neither tried to call Kitchen again or contact any of the other witnesses independently.  This, despite the fact that Karra Vasquez testified that her mother did not speak for her, and that she called Butler's office several times and left messages asking to speak with him, but that Butler never returned her calls.

Respondent argues, and the state courts found, that the fact that Karra Vasquez did not attend trial or any of the hearings constitutes proof of her non-cooperation with Butler.  The Court disagrees.  Despite social worker McHugh's testimony at the post-conviction hearing that she never threatened Karra Vasquez with removal of her children if Karra insisted on

_____

[25]None of the reviewing courts – the state trial court conducting the post-conviction hearing, the state appeals court, and the federal magistrate judge – gave any reason for simply ignoring Kitchen's or Karra Vasquez's testimony that directly contradicted Butler's testimony, such as an explicit negative credibility finding.  Importantly, there is no evidence other than Butler's self-serving testimony that the family would not speak with him about the case, and testimony from the various family members contradicts Butler's assertions of non-cooperation from the family.

helping Vasquez's defense, the critical point is that Karra Vasquez subjectively <u>believed</u> that McHugh had made such a threat.  Kitchen's similar conclusion only bolsters Karra Vasquez's subjective understanding of McHugh's remarks, whatever McHugh may have literally said.  Also, Becky Shaffer testified that Karra Vasquez conveyed her subjective concerns to Becky, further proof of the existence of Karra Vasquez's subjective fears.  In Karra Vasquez's mind, she faced the untenable choice of continuing to support her husband by attending the trial and subsequent hearings, or risk having the state remove her children.  Karra Vasquez even testified to this subjective understanding, saying "I tried to talk to Donald Butler, and it became a point that if I had to choose between my children and my husband, I chose my children."  (Hr'g Tr. at 324:12-14.)

Moreover, the fact that Karra Vasquez did not attend trial or any of the hearings is irrelevant to the question of what she would have told Butler, or what she would have testified to at trial had Butler actually investigated her story.  The fact still remains that Butler did not speak to Karra Vasquez before unreasonably abandoning his investigation.  Had Butler actually returned Karra Vasquez's phone calls, he could have explained to her – as subsequent counsel apparently did, Hr'g Tr. at 332:4-6 – that she would not be at risk of losing her children just for helping her husband's defense.  Instead, Butler abandoned his investigation at an objectively unreasonable juncture.  *See, e.g.*, *Ramonez*, 490 F.3d at 489 (finding that when a witness known to counsel could provide testimony beneficial to defendant, "it was objectively unreasonable for [counsel] not to interview [the witness] (or at least make reasonable efforts to interview [the witness]) before coming to his ultimate choice of trial conduct.").

-39-

As for Becky Shaffer, Butler testified that he determined that Becky would have been unhelpful as a witness for the defense because her husband, Don Shaffer, was listed as a prosecution witness and because she was one of Kitchen's daughters.  Butler's decision was objectively unreasonable, however; he never actually spoke with – or even attempted to speak with – Becky to determine what she knew or would say if called to testify.  Thus Butler's decision that Becky Shaffer would not be a helpful defense witness – whether based on her relationship to Don Shaffer or because of Kitchen's alleged statement that none of her family would help Vasquez's defense – was not based on an objectively reasonable investigation.  The Sixth Circuit has instructed that "[c]onstitutionally effective counsel must develop trial strategy . . . based on what investigation reveals witnesses will actually testify to, not based on what counsel <u>guesses</u> they might say in the absence of a full investigation."  *Ramonez*, 490 F.3d at 489 (emphasis added).  Yet Butler's failure to fully investigate the information Becky Shaffer might provide was based on just that: a guess about what she might say.

Butler essentially (and unreasonably) ended any investigation of potential witnesses and the information they might provide based on a single three-minute telephone call.  Butler thus abandoned his investigation at an unreasonable juncture, making impossible a fully informed decision on what witnesses to call at trial.  *See Wiggins*, 539 U.S. at 527-28.  Butler unquestionably had a duty under *Strickland* to investigate <u>all</u> witnesses who may have information concerning Vasquez's guilt or innocence, see *Ramonez*, 490 F.3d at 487, yet he utterly failed to do so by not speaking with Karra Vasquez, Becky Shaffer, Don Shaffer, or other potential witnesses such as Kitchen, Salopek, or Snyder that he would have learned about in the course of a reasonable investigation.

-40-

### 2.  Failing To Meet Sufficiently With Vasquez[26]

Likewise, Butler unreasonably investigated the case when he failed to fully and sufficiently discuss the case, and the prior convictions and allegations, with Vasquez.  A purportedly strategic decision is not objectively reasonable when counsel has failed to investigate his options and make a reasonable choice between them.  *Towns*, 395 F.3d at 258.  Here, the evidence presented at the post-conviction hearing demonstrates that Butler's "strategic" decision was not objectively reasonable.

The evidence is undisputed that Butler met at most three times with his client, for 15-30 minutes each time.  Butler had no notes of these meetings, and it appears that very little of substance was discussed.  Most significantly, Butler did not discuss with Vasquez the vague allegations that his client had molested other individuals, which Butler alluded to as a basis for his trial strategy.  (See Hr'g Tr. at 139:10-17.)  Butler's testimony establishes that in advance of trial the prosecutor informed Butler of two other supposed accusations of sexual misconduct that had been leveled at Vasquez.  Butler did not, however, conduct any further investigation to determine if there was any truth to the prosecutor's information, and apparently did not even discuss the supposed allegations with Vasquez.  Vasquez testified that he was not aware of one

---

[26]The state court of appeals concluded that Robert's argument that Butler was ineffective because Butler advised Robert not to testify at trial was not part of the appeal because Robert did not make it part of any assigned error.  (ECF No. 31-53, Post-Conviction Relief Appeal, at 787, n.4.)  The state's Appellee's Brief in the instant case, however, argues that the claim was "properly dismissed as *res judicata* as it could have been raised on direct appeal.  (ECF No. 31-48, Brief of Appellee, 20.)

The trial court, however, did not dismiss the claim as *res judicata*, despite the state's representation to the contrary.  Instead, the trial court found that Butler was not directly questioned about his decision not to have Robert testify.  (Post-Conviction Hearing Findings, at 23:¶36.)  The court then found that nothing Robert testified to at the post-conviction hearing "could have had a bearing on the outcome," and in "light of this, Butler advice that defendant should not testify, if he gave it, was professional responsible and wise."  (*Id.*at 26:¶4.)

of the supposed allegations until his sentencing, and that he only learned of the other supposed allegation from testimony at the post-conviction hearing.

Butler had a professional duty to learn as much as he could from the prosecutor, Vasquez, and other witnesses about these supposed additional allegations, especially if he based his trial strategy on them.  Yet counsel did no investigation into these allegations, and thus his trial strategy was not supported by reasoned deliberation as required.

The Court does not mean to suggest that under no circumstances could counsel's failure to put Vasquez on the stand be deemed an objectively reasonable decision.  Indeed, defense counsel frequently decide that the best trial strategy does not include putting the defendant on the stand.  In this case, the decision not to have Vasquez testify would have been a difficult one to make; the charges involved an adult who was alone with a minor at the time of the alleged attack, and the child had testified.  The critical point, however, is that it was objectively unreasonable for Butler to make that decision without first fully investigating the allegations.  *See Towns*, 395 F.3d at 260 (citations omitted).

Based on the foregoing, the Court finds that counsel's performance was so objectively unreasonable that it fell far below the representation required for constitutionally effective assistance of counsel.[27]  Accordingly, the state appeals court's conclusion to the contrary was objectively unreasonable.

---

[27]The instant Opinion should not be taken as a blanket condemnation of Attorney Butler's competence or professionalism.  The Court has known Attorney Butler professionally for many years, and has seen him perform exceptional work in the courtroom in very difficult criminal cases.

### b.  The Prejudice Element: Counsel's Ineffective Assistance
###     Prejudiced Vasquez

As explained, counsel's performance was well below that required for constitutionally effective representation.  Vasquez, however, must still meet *Strickland*'s prejudice prong, i.e. he must show a reasonable probability that but for that deficiency the outcome would have been different.  At the conclusion of the post-conviction hearing, the state trial court concluded that "not one of the witnesses who testified – neither the defendant, his family or others – offered any testimony that could have changed the outcome of the defendant's trial."  (Post-conviction Hearing Findings, at 25.)  The state appeals court agreed with the trial court's statement.  (Post-conviction Appeal Opinion, at 788-89, *Vasquez*, 2004 Ohio 53, *P21.)  The Court, however, finds that Butler's deficient performance prejudiced the defense sufficiently to undermine the reliability of the trial, and thus the state appeals court's findings to the contrary were an objectively unreasonable application of *Strickland*'s prejudice element.

The Supreme Court has explained that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support."  *Strickland*, 466 U.S. at 696.  *See also*, *Towns*, 395 F.3d at 260 (*citing Strickland*, 466 U.S. at 696; *Clinkscale v. Carter*, 375 F. 3d 430, 445 (6th Cir. 2004)).  Just as important for purposes of habeas review, a state court's blanket assessment of the credibility of a potential witness – at least when made in the context of evaluating whether there is a reasonable probability that the witness's testimony, if heard by the jury, would have changed the outcome of the trial – is not a fact determination within the bounds of § 2254(e)(1).  *Ramonez*, 490 F.3d at 490.  Instead, what the state court has <u>really</u> done in that situation "is to state its <u>view</u> that there is not a reasonable probability that the jury would believe the testimony and change its verdict."

-43-

*Id.* (emphasis added).  The Sixth Circuit has made it clear – especially in the context of a *Strickland* evidentiary hearing – that the "Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence."  *Id.* (*citing Barker v. Yukins*, 199 F.3d 867, 874 (6th Cir. 1999)).

In *Barker*, in the context of deciding whether a defective self-defense jury instruction was harmless error, the Sixth Circuit held that the state court crossed the line between findings appropriate for the judge – and therefore accorded § 2254(e)(1) deference – and findings left to a jury, when it found the defective instruction had no consequence because the jury would not have believed the self-defense testimony of the defendant anyway.  *Id.* (*citing Barker*, 199 F.3d at 874).  Whether to believe the defendant's testimony on that score, the court reasoned, was an issue for the jury and not the judge.  *See id.*  Similarly, in *Ramonez*, the state appeals court found that the would-be witnesses would not have provided testimony that would have changed the trial's outcome.  *Id.* at 489.  The government argued that § 2254(e)(1) demanded that the Sixth Circuit defer to the state court's assessment of lack of credibility and helpfulness of the would-be witnesses, which, the government argued, in turn undercut any reasonable probability that the jury would have altered the verdict based on their testimony.  *Id.* at 489-490.  The Sixth Circuit disagreed, explaining that "Section 2254(e)(1) does not support that proposition."  *Id.* at 490.

The Sixth Circuit has further explained the difference between credibility determinations that are for the jury and those made by the state judges that are entitled to the § 2254(e)(1) presumption.  Specifically in the context of a case such as the instant one, "it is for the judge to evaluate the credibility of the criminal defendant and the former defense counsel in

-44-

deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption." *Ramonez*, 490 F.3d at 490 (*citing Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir. 2004)).  The court continued, explaining that such credibility determinations are within a judge's province, but are different in kind from a finding that a jury would not believe a witness's testimony.  *Id.* (emphasis added).  Weighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it is a mixed question of law and fact not within the § 2254(e)(1) presumption.  *Id.* at 491.

    The state court's finding in the instant case is essentially a finding that the jury would not have believed any of the testimony from Karra Vasquez, Becky Shaffer, Joanne Kitchen, Tammy Salopek, Ashley Snyder, or Robert Vasquez, and thus there was no prejudice to Butler's ineffective assistance.  The critical point, however, is not whether the Court believes or disbelieves the testimony that the post-conviction hearing witnesses provided; it is simply a question of what testimony those witnesses would have provided at trial had Butler's performance been effective, and whether their testimony, had the jury heard it, might reasonably have changed the outcome of the trial.

    Significantly, the state's case against Vasquez rested entirely on the testimony of Ashlee Loomis, the victim, who was 9 years old at the time of the alleged sexual assault and 10 years old at trial.  As the prosecutor said in closing argument: "This case comes down to whether or not you believe Ashlee Loomis and her testimony."  (Trial Tr. at 296.)  There was no DNA or other physical evidence presented, and no one besides the victim who witnessed the assault.  The victim did not report the incident for at least 10 days.  The only corroboration was the testimony

-45-

of several adults (a family friend of the victim's father, the victim's father, a police officer, and a social worker[28]) to all of whom petitioner had subsequently given a consistent version of the assault.

Accordingly, counsel needed to develop a strategy of casting doubt on the validity of the victim's testimony. There were three ways to do this: (1) identifying inconsistencies in her version of the facts, based upon the testimony of other witnesses who were present in the house the night of the alleged incident; (2) locating witnesses who would testify to the victim's reputation for untruthfulness; and/or (3) putting petitioner on the stand to refute the victim's testimony. Trial counsel did none of these things. Had he done even one of them, there is at least a reasonable probability that the outcome of the trial may have been different. Since counsel did none of them, petitioner faced an almost certain conviction and a life sentence.

Most significantly, Karra Vasquez's testimony would have dramatically undermined the victim's version of events on the night of the alleged incident. She testified at the post-trial hearing (and presumably would have done so at trial) that Ashlee was wearing a bathing suit that night. Yet Ashlee testified at trial (and in all her prior statements to others) that Vasquez pulled down her pants and underpants while holding his other hand over her mouth so she could not yell out. Karra Vasquez's testimony about Ashlee's clothing alone would have called into question Ashlee's version of the events. None of the other testimony from persons at the condo on July 23, 2000 went directly to personal observations of what Ashlee was wearing that night. Testimony that did discuss the girl's clothing was only in the context of recounting what Ashlee had told the witness about the alleged attack.

---

[28]Detective Chappelle also testified at trial, but he did not interview the victim.

Karra Vasquez's testimony about various other critical observations from the night of July 23, 2000 is also at odds with, and would have cast at least some measure of doubt on, the testimony Ashlee and Steve Loomis provided.  For instance, Karra Vasquez would have testified that Vasquez had previously descended into the basement with their two young girls before Ashlee and Steve Loomis arrived at the condo.  Conversely, Steve Loomis testified that he saw Vasquez in the kitchen when he arrived.  Ashlee, for her part, provided at least two different recollections, first testifying that Don Shaffer was the only adult awake when she and her father arrived, and then testifying that Vasquez and Karra Vasquez were in the living room on the couch watching television when Ashlee and Steve Loomis got to the condo.  Also, Karra Vasquez's testimony would have placed Vasquez already in the basement at the time when Ashlee alleged that he invited her to go down to the basement to watch cartoons.  In yet another instance of conflicting testimony, Karra Vasquez would have testified that Ashlee went down the stairs and back up twice, and that Ashlee was in the basement for no more than five minutes the entire time during which Karra could hear Vasquez changing his daughter's diaper and getting the girls ready for bed.  This directly contradicts Ashlee's testimony that she went downstairs, got on the bunk bed, and only left when her father called to her from the top of the stairs.

Further, Karra Vasquez would have testified at trial that Ashlee's father, Steve, a police officer, was coaching her daughter the night she reported the alleged assault.  Specifically, she would have testified that she heard Ashlee Loomis initially tell her father that the incident had lasted for "four episodes of RugRats" to which Steve Loomis replied that was impossible.  She also would have testified that she heard Steve Loomis and his partner tell Ashlee that she "ha[d] to get this right.  You have to make sure that you know exactly what you are going to say

-47-

and repeat this to every person that asks you.  You can't change your mind."  This testimony, if true, would dramatically undercut the rationale given by the appeals court for concluding that any ineffectiveness by Butler was not prejudicial.  The fact that a nine-year-old girl recounted the same story to multiple people takes on entirely different significance if her father – whom Ashlee testified that she feared and who, she testified, "whups" her when she lies, see Trial Tr. at 59:25–60:18; 101:13-14, – instructed her that she had to tell the same story every time.

Karra Vasquez's testimony about the events on the night of the alleged incident was absolutely essential for defending the case, as she was one of only five adults in the Shaffer condo that night, and one of only three adults awake after the Loomises arrived.  Karra Vasquez also provided a comprehensive account of events on the evening of July 23, 2000 that differed dramatically in critical places from the accounts given by Ashlee and Steve Loomis.  This testimony would have been extremely damaging for the prosecution's case, yet the jury never heard from Karra Vasquez because Butler never interviewed her.

Moreover, had counsel done any investigating, he would have spoken to Don Shaffer's wife, Becky, who was present that night.  Becky Shaffer, like Karra Vasquez, would have testified that she too heard Ashlee asking if she was going to be on TV in the aftermath of the allegations.  Significantly, each woman testified to hearing Ashlee make the comments in independent situations: Becky's testimony about Ashlee's comment in the ambulance would have been especially important for the jury to hear in conjunction with Karra Vasquez's testimony about Ashlee making a similar comment while outside the condo door.  Such testimony might reasonably have caused at least one juror to have at least reasonable doubt about the impetus for Ashlee's allegations.

-48-

Becky Shaffer also would have testified that the Vasquez family had just moved into Don Shaffer's basement on July 23, 2000.  This fact directly contradicts Ashlee's testimony that nothing happened on the day that the Vasquez family moved in with the Shaffers and that the alleged attack happened later.  Becky Shaffer also would have testified that she was upstairs asleep on the night of the alleged incident, and at work on the night Ashlee reported it, which, again, contradicts Ashlee's testimony.

Furthermore, had Butler interviewed Becky Shaffer, she would have put him in touch with Tammy Salopek and her daughter Ashley Snyder.  Salopek was a close friend of Ashlee's father Steve Loomis, while Snyder was good friends with Ashlee Loomis.  Ashlee spent many nights at the Salopek residence.  Both Salopek and her daughter would have testified that Ashlee had a distinct reputation for untruthfulness, and a propensity to tell outrageous lies. (Joanne Kitchen's testimony about Ashlee's character and need for attention might reasonably have further reinforced the picture that Salopek and Snyder painted of the accuser.)

Salopek, who first "met" Vasquez at the post-conviction hearing, also would have testified that Ashlee stayed with her for several nights, starting 3 or 4 days after the alleged assault, and that Ashlee was acting normally and had no difficulty sleeping.  Snyder would have testified similarly.

Salopek's and Snyder's testimony would have impeached the trial testimony of both Ashlee Loomis and her father Steve Loomis, who testified to Ashlee's strange and frightened behavior immediately following the reporting of the incident.  Indeed, the court of appeals even acknowledged as much: finding that Snyder's testimony did not demonstrate sufficient evidence that Ashlee Loomis had made a false rape accusation against her uncle in

-49-

New York, the court explained that "Ashley Snyder's testimony casts doubt generally on the victim's veracity only in <u>this</u> case."  (Post-conviction Appeal Opinion, at 792 (emphasis added).)

The testimony that Salopek and Snyder – as well as Kitchen – provided would have directly impeached Ashlee's credibility and character for truthfulness, a critical task in defending Vasquez when the case rested almost solely on Ashlee's testimony.  Salopek's and Snyder's testimony would have similarly impeached Steve Loomis's testimony.  Butler did not reasonably investigate potential witnesses, however, and thus he never learned of Salopek and her daughter.  Consequently, the jury never heard or considered their potentially devastating testimony.

Additionally, Butler was never questioned why he did not put Vasquez on the stand, but Vasquez testified that Butler had indicated that he feared Vasquez would be subject to cross examination on prior convictions.  Butler said nothing about basing his trial strategy (at least as it relates to putting Vasquez on the stand) on the vague allegations of additional sexual misconduct.  He could not have reasonably done so, because he did not investigate the charges further.  Consequently, Butler was not in a position to make a fully informed decision on how to defend the case and what witnesses to call, and his advice to Vasquez not to testify took away one significant avenue of countering Ashlee's testimony.

Moreover, since there were no formal charges, let alone convictions, Butler would have been in position to file a motion in limine with the trial judge seeking a ruling that the prosecutor could not use these allegations to impeach Vasquez.   Without doing any investigation, counsel was not in a position to file this motion.  Butler's decision made the case a

-50-

"she said" case rather than at least a "he said-she-said" situation, with the jury hearing (unrebutted) testimony from one of the two people who truly knew what happened that night.

While it is certainly true that a jury hearing testimony from Karra Vasquez, Becky Shaffer, Joanne Kitchen, Tammy Salopek, Ashley Snyder, or Robert Vasquez could have discredited their testimony that either attacked Ashlee's character for truthfulness, or her account of the night in question, there certainly remained a reasonable probability that the jury would not have.[29]  All it would have taken is for one juror to disbelieve Ashlee's version of the events.

The sad reality is that Butler went into trial with absolutely nothing, with the predictable result that Vasquez was convicted after a very short jury deliberation.  Butler could only cross-examine Ashlee with general questions, and made virtually no attempt to impeach her credibility, though evidence existed had he done a reasonable investigation.  The ineffectiveness of his preparation, cross-examination, and overall strategy, was highlighted when he asked Ashlee if she had written about the alleged assault in her diary; she replied that she had done so, and that she still had her diary.  Counsel should have never asked this question unless he knew the answer was "no."  But having blundered, he had a professional obligation to demand to see the diary to see whether Ashlee had written anything, and if so, how it compared to her testimony.  Counsel apparently did – and could do – nothing, because he did not investigate the case sufficiently.  Consequently, the jury was left with the devastating impression that Ashlee

---

[29]While it is not within this Court's province to pass on Karra Vasquez's credibility, the Court notes that she was in the process of divorcing her husband at the time of the post-conviction hearing, and thus had little or no incentive to fabricate a story on behalf of Vasquez.  Similarly, Tammy Salopek was not only an entirely disinterested witness in that she had no connection to Vasquez whatsoever, but she also testified that she was close friends with the victim and her father.

had written a contemporaneous account of the assault which was consistent with how she described it numerous times later.

Had Vasquez or the other post-conviction hearing witnesses testified at trial, there is at least a reasonable probability that reasonable doubt could have been created in the minds of the jury.  To find otherwise, as the state courts did, is an objectively unreasonable application of *Strickland*.[30]  Even applying a heavy measure of deference to counsel's decisions, the testimony brought forth at the post-conviction hearing demonstrates that counsel's decisions in advance of and during trial were not reasonable, or supported by reasoned consideration; that ineffectiveness was most certainly prejudicial.  Therefore the state appeals court's decision affirming the trial court's ruling was an unreasonable application of *Strickland*.

## 2.  The State Court's Conclusions Were Contrary to *Strickland*

The Court further finds that the state appeals court's post-conviction opinion holding is contrary to *Strickland*.  Importantly, the appeals court applied the wrong standard to

---

[30]The Court also notes, after comparing the trial and post-conviction hearing transcripts with the state court's Post-conviction Hearing Findings, that the trial court's opinion misconstrued or mischaracterized witness testimony in some places.

Consider the following examples:

1) the court found that Joanne Kitchen, Becky Shaffer, and Karra Vasquez "themselves corroborated" that they refused to help in Vasquez's defense, ECF No. 31-38, 24:¶2, when in fact the testimony is directly contrary to such a finding;

2) the court found that Becky Shaffer "suspected Robert Vasquez had [caused her son's rectal bleeding]", when Becky actually testified that authorities on the scene had told her that she needed to take her son to the hospital in the same ambulance with Ashlee Loomis, *id.* at 19:¶28;

3) the court found that "JoAnn [sic] Kitchen also denied that Sally Weindorf threatened her daughter Mrs. Vasquez with removal of her children if Mrs. Vasquez assisted in her husband's defense."  *Id.* at 15.  While Kitchen declined to explicitly use the word "threaten" to describe the situation, her overall testimony clearly demonstrated that Kitchen believed McHugh had conveyed the idea that Karra Vasquez would lose her children if she helped in her husband's defense;

4) the court found that Tammy Salopek "described Ashlee [Loomis's] character for trustworthiness and honesty by stating that she caught Ashlee lying to her on a few occasions and that she is not extremely trustworthy," *id.* at 17.  In fact, Salopek's testimony entailed substantially more critical assessment of Ashlee's character for truthfulness.

the prejudice element.  The appeals court affirmed the trial court's holding, reasoning that Vasquez could not show that "the outcome of his trial <u>would have been</u> different" had Butler called at trial the witnesses who only testified at the post-conviction hearing.  (Post-conviction Appeal Opinion, at 788, *State v. Vasquez*, 2004 Ohio 53 at *P20 (emphasis added).)  The trial court, for its part, recited an incorrect standard at least twice in the Post-conviction Hearing Findings, declaring that *Strickland*'s second prong requires a petitioner to show that "the result of petitioner's trial or legal proceeding <u>would have been</u> different had defense counsel provided proper representation."  (Post-conviction Hearing Findings, at 4:¶10; 5:¶11 (emphasis added).)

The Supreme Court, however, specifically rejected an outcome-determinative test in *Strickland*, 466 U.S. at 693-94.  *Smith v. Lafler*, 175 Fed. Appx. at *6 n.1.  Thus, Vasquez's burden under *Strickland* is not to show that the outcome of his trial <u>would have been</u> different. *See id.* (stating that to require a habeas petitioner "to show that the outcome of the proceedings would have been different" is "contrary to Supreme Court precedent.").  Instead, Vasquez is only required to show a "reasonable probability" that the outcome would have been different but for Butler's errors.  Simply stated, the appeals court applied a higher (and potentially impossible) burden than the already substantial burden required under *Strickland*.[31]  Such application was,

---

[31]While the appeals court subsequently stated that "[w]e agree with the trial court's conclusion that 'not one of the witnesses who testified [at the post-conviction hearing] offered any testimony that could have changed the outcome of defendant's trial,'" Post-conviction Appeal Opinion at 788-89, *State v. Vasquez*, 2004 Ohio 53 at *P21, the court then repeated its erroneous application of a higher burden to a second portion of Vasquez's ineffective counsel claim: "We have already determined that none of defendant's evidence dehors the record, namely, the witnesses who testified at the post-conviction hearing, <u>would have changed</u> the outcome of his trial."  (Post-conviction Appeal Opinion at 789, *State v. Vasquez*, 2004 Ohio 53 at *P22 (emphasis added).)

Additionally, this statement seems to indicate that the court evaluated the witnesses in isolation, as if Vasquez must prove that a single witness's testimony would cast doubt on the outcome.  The proper focus must be on the <u>cumulative</u> effect of the witnesses' testimony. *Towns*, 395 F.3d at 257 (*quoting Wiggins*, 539 U.S. at 536).

therefore, contrary to *Strickland*. This error, in and of itself, would not necessarily be enough to grant the writ, if there was no basis to cast doubt on the outcome. That is not the case here, however. The Court finds that the error was prejudicial, not harmless, because there was at least a reasonable probability that but for counsel's ineffectiveness the outcome of the trial would have been different.

## C. The Writ Must Be Granted

The Sixth Amendment right to counsel guarantees a defendant minimally competent representation. The case law clearly instructs that what is reasonable to expect counsel to do is measured by the facts and circumstances of each case. The prejudice prong of *Strickland* requires an examination of the strength of the prosecution's case, what counsel did to counter it, and whether there were things a minimally competent counsel should have done which may have made a difference. After carefully reviewing the entire record in this case, including all trial and post-conviction hearing testimony, the Court is left with the inescapable conviction that petitioner was denied his Sixth Amendment right to effective assistance of counsel. Because Vasquez has established that his trial counsel was constitutionally deficient and that he was prejudiced by this deficient performance, he is entitled to the issuance of a writ of habeas corpus.

## IV.  CONCLUSION

For the reasons stated above, the writ of habeas corpus is **CONDITIONALLY GRANTED**.  Unless the State of Ohio elects to retry Robert Vasquez and does so within 120 days of issuance of this Court's final judgment entry, Vasquez must be unconditionally released.

**IT IS SO ORDERED.**


*/s/Dan Aaron Polster     October 3, 2007*
**Dan Aaron Polster**
**United States District Judge**